# Exhibit 2

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| CONLIN, Rochelle | 785140-20-0039 | 4 |

**SUMMARY OF EVENT:**

**<u>Interview of CONLIN:</u>** ATF Agents interviewed Rochelle CONLIN in reference to her multiple firearm purchases.

**NARRATIVE:**

1. On May 20, 2020, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agents (SA) Tiffany Menotti and Fletcher Ogg made contact with Rochelle CONLIN (W/F, DOB: [redacted] 1987) in reference to her multiple firearm purchases. Contact was made with CONLIN at her residence located at 276 Santa Cruz Ave, Bullhead City, AZ 86442 in Mohave County in the State of Arizona.

2. The consensually recorded communications are summarized below, those summaries do not include references to all statements made by the speakers on the topics that are described. SA Menotti has reviewed the recordings to complete this report. For a full record of the events refer to the recordings, the following is a summarized account.

3. SA Menotti and SA Ogg introduced themselves to CONLIN and showed her their ATF credentials. CONLIN invited the Agents into her residence. SA Menotti verified CONLIN's information. CONLIN confirmed her name, date of birth, and address and advised she had lived at the residence a "couple months."

4. SA Menotti advised CONLIN that a firearm she had recently purchased had come up in a firearms trace. CONLIN indicated towards some papers and advised that she needed to "report all of these." CONLIN explained that her and a guy she was "talking to" split up and that he took all the firearms from her residence in April.

5. CONLIN stated, "Honestly, I'm gonna be honest with you he was the one, like, he would build me up and talk to me about all of these guns and show me everything cuz he had some guns so he would show me everything about em and I got super excited about em so the things that he had I went and got too. And so I'm not really big on these things." CONLIN advised that her ex had taken almost all the firearms except for one .380 that she still had.

6. SA Menotti asked CONLIN if she remembered the Smith and Wesson M&P 40 (referencing the eTrace) that

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Tiffany L. Menotti | Special Agent, Flagstaff Field Office | [signature] | 05/21/2020 |
| **Authorized by:** Fletcher S Ogg | **Title:** Acting Resident Agent in Charge, Flagstaff Field Office | **Signature:** [signature] | **Date:** 5/22/2020 |
| **Second level reviewer (optional):** Gabriel R. Pinon | **Title:** Special Agent in Charge, Phoenix Field Division | **Signature:** | **Date:** |

she had purchased. CONLIN stated, "I've heard of all of the guns, hun. Honestly….I wouldn't be able to pick it out in the middle of anything." CONLIN provided SA Ogg with the paperwork related to all her firearms purchases.

7. SA Menotti asked what CONLIN's ex-boyfriend's name was and she advised "Christian MILZ" (later identified as Keymal RUCKER, B/M, DOB: [redacted] 1991)(refer to ROI 6 for further details). CONLIN further advised he lived in Laughlin, NV and his DOB was [redacted] 1989. CONLIN explained RUCKER would stay with her at her residence but he did not reside with her. CONLIN advised they met in May of 2019 and they dated until about a month ago. CONLIN explained that RUCKER stopped calling her and texting her for no reason and she had not heard from him since.

8. CONLIN advised that they did not start buying guns until October of 2019. CONLIN described that they kept the purchased firearms at her residence in their cases and about 10 firearms in a small safe. CONLIN would not give an exact number of firearms that she had purchased but advised RUCKER had taken all but one of them.

9. CONLIN advised RUCKER stopped talking to her around March 20, 2020, and shortly after that all of the firearms disappeared from the residence. CONLIN explained that she worked full time and went to school full time and she used to keep her residence door unlocked. CONLIN believed RUCKER took the firearms from her residence while she was away from home.

10. SA Menotti asked if RUCKER would go with CONLIN to purchase the firearms and she advised he would come with to show her the firearms to buy since she did not know anything about firearms. CONLIN advised they had purchased firearms from multiple different FFL's. Initially, CONLIN stated, "I would pay for em." CONLIN then explained that RUCKER would pay for some of them because "I don't have that kind of money all the time." CONLIN advised she was out of work since the end of March but prior to that she was working at Bullhead Urgent Care.

11. CONLIN believed the last time she had purchased any firearms was at the beginning of March SA Menotti showed CONLIN an ATF form 4473 from Pawn Plus, dated March 28, 2020, and asked if CONLIN remembered completing the form. CONLIN advised she did and that she recognized her information filled out on the form. SA Menotti asked CONLIN about the 2535 McCormick Blvd address listed on the Form 4473 and CONLIN explained it was the address listed on her driver's license but she did not reside there when she purchased the firearm. The form documented CONLIN purchasing one Glock, model 22, .40 caliber, pistol, serial number NFA138.

12. CONLIN advised she had read the information on the form in the past. SA Menotti pointed out that CONLIN filled out the form and purchased the firearm on March 28th which was after the date that RUCKER took the firearms. CONLIN advised Agents she would have to look at her phone to know when RUCKER stopped talking to her.

13. CONLIN referenced her phone and observed RUCKER last messaged her on April 16, 2020. SA Menotti asked CONLIN if she remembered purchasing two Springfield firearms (a .357 and .45) from Pawn Plus on 3/26/2020. SA Menotti also observed that is was only two days before the 3/28 purchase, which seemed fast. CONLIN stated, "Oh there's a lot that are really quick. That he's, that we've. got. But he made it all seem so, like, legit. Like, I bought them all and we would go shooting."

14. SA Menotti asked CONLIN how many guns per week she was buying and CONLIN stated, "Probably five, six." SA Menotti asked CONLIN how much she was spending in guns per week. CONLIN stated, "a thousand

to twelve hundred." SA Menotti pointed out that it was a lot of money and asked how much RUCKER was providing to pay for the guns. CONLIN admitted RUCKER was buying most of the firearms with his money.

15. SA Menotti asked CONLIN what happened at Mr. Pawn. CONLIN explained the Pawn Store observed her son get into RUCKER's vehicle and they believed she was buying the firearms for RUCKER so they stopped selling her firearms. SA Menotti advised CONLIN that she also believed CONLIN was getting the firearms for RUCKER. CONLIN stated, "well he did buy me some guns but he did ask me to get him some too." SA Menotti asked how many firearms CONLIN had purchased for RUCKER and she stated, "probably a majority of em."

16. CONLIN explained it started with RUCKER teaching her about guns and taking her shooting then it became overwhelming and he "got controlling." CONLIN advised that RUCKER was threatening that if she did not purchase the guns he would hurt her and her kids. SA Menotti asked if RUCKER was allowed to have firearms and CONLIN advised she was not sure.

17. SA Menotti asked when CONLIN first purchased RUCKER a firearm and she advised it was in September or October. CONLIN advised she purchased her a .380 that day and another firearm for RUCKER with RUCKER's money. CONLIN explained RUCKER would send pictures to CONLIN of the firearms he wanted her to buy and of firearms he thought she would like. CONLIN further explained eventually he stopped sending pictures of firearms she might like.

18. SA Menotti asked if all the firearm purchases had started when she still lived at McCormick. CONLIN stated, "No, I had just moved in here." SA Menotti clarified that CONLIN had last lived in McCormick in 2014 and CONLIN agreed that it was accurate.

19. CONLIN explained that RUCKER would accompany her to the stores and point out the firearms he wanted her to buy then he would either slip cash into her back pocket or he would give her the money outside the pawn store. CONLIN was unsure of the denominations of the cash she was provided. After leaving the FFL, CONLIN advised they would come back to her residence and RUCKER would take the firearms from her residence. CONLIN believed RUCKER was bringing the firearms to his apartment in Laughlin, NV.

20. CONLIN advised she thought RUCKER was keeping the guns but she was recently told that RUCKER was posting the firearms to his SnapChat to sell. CONLIN advised RUCKER never paid her any money for purchasing the firearms.

21. SA Ogg directed CONLIN to the ATF Form 4473 dated March 28, 2020. CONLIN advised she remembered purchasing the firearm. SA Ogg asked if CONLIN knew where the firearm was and CONLIN stated, "He's got it." SA Ogg asked if RUCKER gave CONLIN the money for the firearm while they were standing in the store. CONLIN advised she did not remember because a couple of times he had given her money outside the store.

22. SA Ogg asked if CONLIN remembered reading the form and CONLIN agreed she did. SA Ogg directed CONLIN to question 11. a. Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.** SA Ogg pointed out that CONLIN had marked the form "yes." SA Ogg then asked if RUCKER gave her the cash, who was the actual buyer? CONLIN stated, "He was." SA Ogg explained that CONLIN signed the ATF Form 4473 indicating it was true when it was not. CONLIN agreed.

23. SA Ogg asked CONLIN how many firearms she had purchased. CONLIN stated, "I couldn't tell you." SA Ogg asked if it was 50 or 100 and CONLIN stated, "probably around there." SA Ogg asked how many of those guns were actually for CONLIN and she explained maybe 10 of them. SA Ogg then asked how many of the ten firearms she still possessed and CONLIN advised one.

24. SA Ogg asked CONLIN about the last firearm she had purchased for RUCKER. CONLIN advised they went to High Desert Heat because RUCKER wanted some ammunition and to look at firearms. When they got to the store, he pointed out a firearm he wanted to purchase and she filled out the Form 4473 to purchase the firearm for RUCKER. SA Ogg asked CONLIN if the firearm was for her and she shook her head indicating no. SA Ogg asked if RUCKER gave her the money in the store and CONLIN advised she thought he put it in her back pocket or outside the store.

25. SA Ogg asked if CONLIN used the McCormick address when she filled out the form and CONLIN indicated she did. SA Ogg asked if she resided at McCormick when she purchased the firearm and CONLIN said she lived "here." CONLIN attempted to explain to SA Ogg that they told her to use the address on her ID. SA Ogg asked CONLIN if she had a driver's license with the 276 Santa Cruz address on it. CONLIN stated, "Not yet." During the Search Warrant, Agents found two Arizona Driver's Licenses bearing the 276 Santa Cruz address (one issued December 2019 and one issued May of 2019 (refer to ROI 5 for further details on the search warrant).

26. SA Ogg asked what happened after CONLIN purchased the firearm. CONLIN advised they got into the car and left. SA Menotti asked if RUCKER was doing any other illegal activities. CONLIN advised she believed RUCKER was selling drugs also.

27. SA Ogg again asked about the incident at Mr. Pawn. CONLIN advised her and RUCKER went to Mr. Pawn. RUCKER told her he saw a gun he wanted to look at. CONLIN couldn't remember what kind of firearm it was. SA Ogg asked if it was a Draco and CONLIN advised "probably." CONLIN explained she thought RUCKER placed the money in her back pocket and she purchased the firearm for RUCKER.

28. CONLIN explained that after they left the store, her son started going to RUCKER's car so CONLIN walked with him. CONLIN advised they all got into his car and then she left the gun in his car and got into her own car and they left to get coffee. CONLIN advised his Charger had a California plate and she had heard that he recently bought a BMW.

29. SA Menotti asked CONLIN if she used drugs and she said no. SA Menotti asked CONLIN if there was anything illegal in the residence and CONLIN advised no. During the search warrant executed at CONLIN's residence, Agents found cocaine in her dresser drawer.

30. SA Ogg asked if RUCKER had ever gone into the store and attempt to buy a firearm himself. CONLIN advised no. SA Ogg asked why RUCKER wanted CONLIN to do it and CONLIN stated, "Because he had a California license." CONLIN agreed that she knew RUCKER could not purchase firearms in Arizona because of his California ID. CONLIN was not sure if RUCKER had other people purchasing firearms for him.

31. SA Ogg asked CONLIN to show him the messages from RUCKER about the firearm purchases. CONLIN produced her phone and allowed SA Ogg to review the messages. CONLIN consented to allow Agents to extract the data from her phone. Resident Agent in Charge (RAC) Wayas brought the phone to Bullhead City Police Department where a cell phone extraction was performed. The phone was returned to CONLIN at the end of the Search warrant.

32. CONLIN advised she was equally as scared of RUCKER as she was of Agents. CONLIN advised RUCKER would threaten her by telling her his sister had caught charges for harming other women that had gone crazy on him. CONLIN believed RUCKER could shoot up her residence.

33. CONLIN provided SA Menotti with RUCKER's phone number as [redacted]9669. CONLIN provided Agents with her phone number as [redacted]6957.

34. SA Menotti explained to CONLIN that a Federal Search warrant had been issued for her residence. SA Menotti sat with CONLIN through the execution of the Search Warrant. Prior to the search warrant, CONLIN advised SA Menotti that she had cocaine in her dresser drawer. CONLIN provided SA Menotti with the cocaine. ATF Agents executed the search warrant wearing plain clothes in consideration of CONLIN's security concerns (refer to ROI 5).

35. The recorded communications were downloaded and entered into ATF evidence as Item #7.

**ATTACHMENTS:**

- Firearm records/receipts provided by CONLIN
- Audio recording of interview