# Exhibit 3

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| CONLIN, Rochelle | 785140-20-0039 | 12 |

**SUMMARY OF EVENT:**

**Interview of RUCKER:** ATF Agents interviewed Keymal RUCKER in reference to his possession of firearms.

**NARRATIVE:**

1. On May 27, 2020, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent (SA) Tiffany Menotti and Resident Agent in Charge (RAC) Rustin Wayas made contact with Keymal RUCKER (B/F, DOB: [redacted]1991) in reference to his possession of firearms. RUCKER was initially contacted in a traffic stop made by Las Vegas Metropolitan Police Department (LVMPD) (refer to ROI 8 for further details). RUCKER was detained and transported to LCMPD located at 101 Civic Way #3, Laughlin, NV, for an interview.

2. The consensually recorded communications are summarized below, those summaries do not include references to all statements made by the speakers on the topics that are described. SA Menotti has reviewed the recordings to complete this report. For a full record of the events refer to the recordings, the following is a summarized account.

3. RAC Wayas and SA Menotti entered the video and audio recorded interview room. RUCKER was sleeping leaned back in a chair with his legs propped up on another chair and his right hand handcuffed to a stationary handcuff pole. RAC Wayas woke RUCKER up and the agents introduced themselves as ATF Agents.

4. SA Menotti asked if RUCKER had ever had his Miranda Rights read to him in the past. RUCKER stated, “yeah.” SA Menotti asked RUCKER if he understood them in the past and RUCKER stated, “yeah.” SA Menotti read RUCKER his rights per Miranda and asked if he understood his right. RUCKER stated, “yeah.”

5. SA Menotti showed RUCKER his California Identification card and asked if it was RUCKER’s. RUCKER advised it was. SA Menotti asked if the Sancroft address was RUCKER’s address. RUCKER made a weary facial expression at SA Menotti and SA Menotti asked if RUCKER lived at 2220 Cougar Ln and RUCKER stated, “yeah, yeah, yeah.” SA Menotti verified RUCKER’s name, date of birth, and address.

6. SA Menotti asked RUCKER if he knew why they were there today and RUCKER advised he had no idea. SA Menotti advised they were there because of firearms and RUCKER asked what that has to do with him. SA Menotti advised RUCKER that she was aware he was a felon and that he was not supposed to have firearms.

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Tiffany L. Menotti | Special Agent, Flagstaff Field Office | [signature] | 06/01/2020 |
| Authorized by: Rustin R. Wayas | Title: Resident Agent in Charge, Flagstaff Field Office | Signature: [signature] Digitally signed by RUSTIN WAYAS Date: 2020.06.01 21:32:22 -07'00' | Date: |
| Second level reviewer (optional): Gabriel R. Pinon | Title: Special Agent in Charge, Phoenix Field Division | Signature: | Date: |

RUCKER advised that he was not sure that he could not have firearms. SA Menotti asked RUCKER to explain. RUCKER advised that he was supposed to go back to court and get his felony "expunged."

7. SA Menotti asked if RUCKER ever went back to the court and got his felony expunged and he said no but explained he could not because of COVID. SA Menotti asked which charge that was for and RUCKER advised he had only been convicted of one charge. SA Menotti clarified that it was the burglary felony. RUCKER agreed that was correct. RUCKER then explained that when he was discharged from parole, his parole officer gave him information to get his charge expunged. SA Menotti clarified that the charge had not been expunged so RUCKER was still prohibited from possessing firearms. RUCKER stated, "yeah, guess so."

8. RUCKER advised he had tried to start the process to expunge the charge from his record around April 15, 2020. RUCKER further advised he had gone to the court in Lancaster, California. SA Menotti confirmed RUCKER lived with his girlfriend (Jasmine MCELROY, H/M, DOB: [redacted]1992) and their two kids [redacted]. RUCKER advised they had lived there about a year and paid $800.00 a month in rent.

9. RUCKER explained that he "engineered" music and worked on a job-by-job basis for a company named Firehouse ENT out of Las Vegas. SA Menotti asked if MCELROY had a job and RUCKER advised she "does hair" but is not employed in Laughlin. RUCKER further advised MCELROY works in Lancaster at her Aunt's shop.

10. RAC Wayas asked how much RUCKER made engineering a song. RUCKER advised it depended and explained that he just worked on two albums which was 16 songs and he charged the guy $3200. RUCKER further advised that it was a friend of his so he gave the artist a deal. RUCKER advised for some people he would do the work for free.

11. RAC Wayas asked if RUCKER did enough work to support himself. RUCKER advised he "most definitely" did. RAC Wayas asked RUCKER how much he would make in a year. RUCKER advised it "depends" and that it was "kinda hard with the rap." SA Menotti asked if it varied from year to year and RUCKER agreed that it did.

12. RUCKER explained before he became more well-known he made about $1000.00 per month. RUCKER advised making it in his job was all about "social media." RUCKER later told Agents that he did not have any social media accounts. SA Menotti mentioned it was good that RUCKER was able to stay employed through the epidemic. RUCKER advised it was but stated, "it's not what I want." SA Menotti asked what RUCKER wanted and RUCKER stated, "I want to be rich off of it."

13. RUCKER explained that he was "independent" and worked for himself but he works on a job-by-job basis with Firehouse ENT.

14. SA Menotti explained to RUCKER that they had a search warrant for his residence, the Charger, and the BMW. RUCKER advised both the cars were his "wife's" and that the apartment was leased to her. RUCKER explained that he had moved in with MCELROY about a year ago and lived there on and off.

15. RAC Wayas asked where RUCKER kept his clothes and RUCKER advised in the car. RAC Wayas asked which car because few clothing items were found in the vehicle. RUCKER advised most of his clothes were kept at MCELROY's residence.

16. RUCKER explained the reason he stayed on and off at MCELROY's house was because she was not allowed to have anyone stay there for longer than two weeks. RUCKER advised that he had stayed there for a while lately.

17. RAC Wayas asked why the apartment complex would care if he stayed there and RUCKER explained the apartment complex did not mind if he stayed there. RUCKER stated, "I wouldn't pass a background check so they would initially deny her. So that's why I can't get put on the lease."

18. SA Menotti asked if MCELROY paid for the apartment. RUCKER advised MCELROY pays for the apartment with social security she receives for their daughter. RUCKER explained he helps with some of the bills.

19. SA Menotti advised RUCKER that MCELROY had told agents about his ex-girlfriend Rochelle CONLIN. SA Menotti asked about CONLIN and RUCKER advised they met about a year ago and started dating because he needed a place to stay. RUCKER explained they broke up about two weeks ago and he has been staying with MCELROY since then.

20. RUCKER advised that CONLIN and MCELROY had never met and had never exchanged anything. RUCKER explained that CONLIN had been over to the apartment complex but never up into the apartment. RUCKER advised that CONLIN would meet him on the backside of the apartment. RUCKER explained that while they were together he would stay at her residence.

21. RUCKER explained that he and CONLIN had broken up because she was talking to another guy and they had an argument about it. RUCKER further explained CONLIN had purchased him a phone that she was paying for and she shut the phone off and threatened to call the cops and tell them that he had a gun.

22. RUCKER explained the guy CONLIN was talking to went by "Bear" and was an employee at Mr. Pawn. RAC Wayas asked if RUCKER had ever met Bear and RUCKER advised he had met Bear in Mr. Pawn when he was with CONLIN. RAC Wayas asked why RUCKER was in the pawn store and RUCKER explained that he went with CONLIN when she was purchasing a .380. RUCKER denied helping CONLIN pick out the 380.

23. SA Menotti asked RUCKER other than the 380 CONLIN had if CONLIN had other firearms. RUCKER stated, "oh wow um um I cant mention them all." RAC Wayas asked how many he thought and RUCKER guessed 25.

24. RAC Wayas asked where she got them and RUCKER advised Mr. Pawn and M&M. SA Menotti asked RUCKER if he had ever gone shooting with CONLIN and RUCKER stated, "Yeah, yeah, yeah multiple times." RUCKER followed up saying they went shooting at "Silver creek."

25. SA Menotti asked RUCKER if CONLIN knew him by "Keymal Rucker." RUCKER paused slightly before he said "yeah." RAC Wayas asked RUCKER if he had a gun. RUCKER explained that CONLIN had given his a .40 Glock and a Draco as a birthday gift. RUCKER advised the firearms were at his residence and explained that both firearms should be at the residence.

26. SA Menotti asked if there was anything else that was illegal in the residence and RUCKER advised he had marijuana in his residence but explained that was not illegal in Nevada. Agents explained that marijuana was still illegal under federal law.

27. RAC Wayas asked how much marijuana you could have under Nevada law. RUCKER guessed about a pound but advised he did not have a pound. Over three pounds of marijuana were found in RUCKER's residence

(refer to ROI 10 and 13). RAC Wayas clarified that CONLIN had purchased the firearms for RUCKER. RUCKER explained that CONLIN had surprised him with the firearms.

28. RUCKER believed she paid for the firearms with financial assistance she received for schooling. RAC Wayas asked RUCKER if he just "thought" he could have guns. RUCKER stated, "Yeah but at the moment its, its all this pandemic and everything people are looting and everything honestly…I mean I mean I was mostly worried about the safety of myself, everyone is going around looting."

29. SA Menotti advised RUCKER that they actually found the Glock .40 in his car. RUCKER advised he put the firearm there. RUCKER explained CONLIN bought him the drum magazine with the Glock but he had purchased the 30 round magazine.

30. Agents asked RUCKER where CONLIN kept the firearms and he advised they were at her residence. SA Menotti asked RUCKER if he was with CONLIN when she purchased the Draco found in his residence. RUCKER advised he was not sure. RUCKER further explained that he was with CONLIN when she purchased a Draco for herself that Mr. Pawn believed she gave to RUCKER.

31. RUCKER explained that CONLIN had to go to class after the firearm was purchased so CONLIN's son got into the car with RUCKER and RUCKER took the firearm back to CONLIN's residence. Mr. Pawn banned CONLIN after that incident. RUCKER was not sure if that was the same Draco that CONLIN gave to him.

32. SA Menotti asked how many guns RUCKER had observed CONLIN purchase over the 15 month he knew her. RUCKER advised approximately 15 guns. RAC Wayas asked RUCKER what CONLIN did for a living and he advised she was a medical assistant. RAC Wayas asked if CONLIN spends most of her money on firearms. RUCKER explained he doesn't know what she does and told agents they would have to ask her.

33. SA Menotti asked RUCKER what he thought CONLIN might say if agents spoke to her. RUCKER advised that he did not believe CONLIN would tell agents that she bought the guns for RUCKER "for the simple fact that she's not supposed to do that." RUCKER further advised that CONLIN might tell agents that RUCKER stole the guns from her.

34. Agents asked if MCELROY had any guns and RUCKER advised she had a small gun. RAC Wayas advised they had found a small Kimber and RUCKER agreed that was the gun. RAC Wayas told RUCKER that the agents had spoken to MCELROY and she told agents that she had purchased all the guns.

35. RUCKER appeared confused and asked why she would do that. RUCKER further advised that MCELROY was just trying to cover for him and protect RUCKER. RUCKER explained MCELROY had nothing to do with his firearms.

36. RAC Wayas explained that now was the time for RUCKER to be honest. RUCKER asked honest about what and SA Menotti told RUCKER to start with his drugs. RUCKER advised he did have cocaine on his person and it was his personal use. RUCKER refused to provide any names of where he got the cocaine.

37. Agents asked RUCKER what kind of pills were located in the yellow box found in the kitchen and RUCKER advised it was MDMA. SA Menotti asked why RUCKER has a scale in the box. RUCKER advised that he used the scale to ensure that he was getting the correct amount of weed that he pays for. RUCKER advised he buys the weed from a guy also. RUCKER confirmed that he does not legally purchase his weed from a store in Nevada.

38. Agents asked about the mushrooms also found in the kitchen. RUCKER advised he bought 21 grams of mushrooms from a different guy recently. RUCKER suggested that he was going to use the mushrooms with the "wifey." RUCKER explained that MCELROY did not know about the drugs in the kitchen and that she would be mad if she found out.

39. SA Menotti asked about the bags of weed located in the lower cabinets and RUCKER advised that was his "Shake" and he used it to with "pre rolls." RUCKER advised the "shake" was cheaper to purchase than the actual marijuana buds. RUCKER explained the weed under the cabinet was his everyday weed to smoke and the buds were for him t smoke if he wanted to go to sleep.

40. SA Menotti asked about the dark blue pills located in the cabinet. RUCKER advised they were morphine pills. SA Menotti asked if RUCKER had a prescription and he advised he acquired from his neighbor in the apartment complex. RUCKER explained that his neighbor just "gave" him the pills for pain he was having.

41. SA Menotti clarified that the master bedroom was the room located at the end of the hallway. RUCKER agreed it was. SA Menotti told RUCKER that they found cocaine in his room also and RUCKER advised that he thought he had put it in his pocket.

42. RAC Wayas asked if all the drugs found in the house were RUCKER's or MCELROY's. RUCKER advised all the drugs were his. RAC Wayas asked RUCKER who the $8000.00 in cash located in the car and $6000.00 in his pocket belonged to. RUCKER advised the cash in his pocket was his money from music work. Agents asked how RUCKER gets paid for his job. RUCKER explained he was paid in Cash and on CashApp. RUCKER further explained that his CashApp account had been locked.

43. RUCKER explained the $8000.00 was MCELROY's money from her Tax return and her stimulus check. RUCKER further explained that MCELROY got $6300 from taxes and $2200 from stimulus. RAC Wayas asked if RUCKER received a stimulus check and RUCKER advised he did not even though he filled out the tax non-filer form. RUCKER explained he did not pay taxes last year. RUCKER advised he still has not received a stimulus check.

44. Agents asked about the embossing machine found in the spare room. RUCKER advised a friend of his sent the embosser to his residence and advised it was not his machine. RUCKER explained that the machine was used for "embroding." RUCKER was defensive of the embossing machine and would not explain what it did. RUCKER was upset that his friend had sent the machine to his house and stated, "I don't even send nothing like that to my house."

45. Agents asked about the Tannerite and whether RUCKER had been shooting with it. RUCKER advised he had gone shooting with two of the tannerite containers and had used CONLIN's "10 mm." SA Menotti asked if RUCKER had gone with CONLIN when she purchased the firearms. RUCKER advised he had gone "a lot" (approximately 20 times) but he also let CONLIN use his Charger to go the Gun Stores.

46. SA Menotti advised RUCKER that the Agents had spoken with multiple gun stores and they knew CONLIN had purchased approximately 90 firearms. RUCKER acted surprises and advised he had never observed that many guns at CONLIN's residence.

47. Agents asked when CONLIN purchased the firearms for RUCKER and he advised she bought them for his birthday last August (08/27/2019). The records show the Draco found in RUCKER's residence had been purchased on 3/8/2020.

48. RUCKER advised that he had no knowledge of CONLIN's firearm purchases and explained she could be purchasing firearms for her "baby daddy" or Bear. RUCKER also explained that CONLIN was from California also.

49. RAC Wayas asked why there were receipts from firearms purchases made by CONLIN in his car. RUCKER advised he only had three receipts from CONLIN. Agents found multiple receipts in both his car and residence with CONLIN's information.

50. RAC Wayas asked how many times RUCKER has gone out to California in the last year and RUCKER advised "maybe 5." SA Menotti asked RUCKER what his phone number was and RUCKER stated "323" then became very suspicious and asked why Agents wanted his phone number. RUCKER became physically and verbally agitated and defensive when agents began speaking about his phone. RAC Wayas advised that agents would apply for a warrant to get into RUCKER's phone. RUCKER's eyes widened and he appeared nervous.

51. RUCKER refused to give agents permission to review his phone. RAC Wayas asked if Agents reviewed RUCKER GPS information on his phone, how many times would they see RUCKER had gone to California. RUCKER changed his mind and advised he may have gone to California more than five times. RUCKER finally agreed that he and MCELROY go to Lancaster, CA, pretty frequently.

52. SA Menotti asked RUCKER if he had ever asked CONLIN to purchase firearms for him. RUCKER stated, "The only ones I told you was the ones I mentioned I wanted. The draco and the .40." RUCKER believed CONLIN purchased the firearms because she wanted to be like "Mr. and Mrs. Smith."

53. RUCKER was not aware of CONLIN purchasing guns for anyone else and he had never observed her taking firearms to California. RAC Wayas asked RUCKER if he believed that CONLIN would lie about the firearm purchases. RUCKER explained there was animosity between him and CONLIN from their break up.

54. RUCKER further explained that, after their breakup, he went to reactivate the phone CONLIN bought for him at the Sprint store. While he was there, the Sprint employee told RUCKER that he could not return the phone to him because it had been reported lost or stolen. SA Menotti clarified that it had been within the last two weeks that RUCKER and CONLIN had separated. RUCKER changed his mind and advised it might be more like a month "to be safe."

55. SA Menotti asked RUCKER if he had ever threatened CONLIN and he said, "No! She has guns." RUCKER further explained the firearms were CONLIN's legal guns and she could shoot and kill him and no one would care.

56. Agents explained to RUCKER that he was being provided with his opportunity to provide his side of the story. RUCKER advised Agents that he was not aware of why he was there. RAC Wayas explained that they were there to get more information related to the trafficking of firearms. SA Menotti explained that he was a felon in possession of firearms and he was in trouble for that. RUCKER stated, "Yeah, I'm a felon and I wasn't supposed to possess the gun I have no problem with that I will take my consequences for me possessing the gun under being a felon." RUCKER denied any further knowledge of firearms trafficking.

57. Agents explained the Federal arrest process and that RUCKER was being arrested for being a felon in possession of a firearm. Agents then left the interview room and deactivated the audio recording.

58. Throughout the interview, RUCKER was easily upset and details in his story changed. Statements made by RUCKER during the interview were in conflict with many of the statements made by MCELROY during her separate interview (ROI 11).

59. The recorded communications were downloaded and entered into ATF evidence as Item #54.

**ATTACHMENTS:**

- Recordings of interview